You can proceed. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Sanjance Johanson. I represent the Plaintiff Appellants in this matter. I'm joined by my co-counsel, Mrs. Brown, at counsel's table. She will not be speaking this morning. With the Court's permission, I'd like to reserve five minutes for rebuttal. Thank you. Your Honor, I'm here to speak on behalf of the Plaintiff Appellants. I'm here to speak on    the U.S. Department of Agriculture, has authorized the North Project, a series of timber sales that over the course of ten years of implementation may lead to the removal of up to just over 9,000 acres of spotted owl habitat. That's over 14 square miles of spotted owl habitat, and lead to the expected abandonment of five currently occupied spotted owl sites in the project area. This at a time that the spotted owl population is declining across its range, approximately 5% per year across its entire range, and approximately 34% between 2011 and 2016. We raised a number of points in our brief, Your Honors, that we think all merit the Court's attention, but this morning I'd like to focus on four issues in particular. First, the Fish and Wildlife Service's zero-take determination. Second, the Fish and Wildlife Service's failure to analyze how northern spotted owls could recolonize the project area after many generations without suitable habitat. Third, the Bureau of Land Management's failure to analyze significant effects under NEPA. And finally, the Bureau of Land Management, or BLM's, failure to parent EIS. Your Honors, the Fish and Wildlife Service violated the Endangered Species Act with its unlawful zero-take determination because it fails to account for precluded reoccupancy as a form of logging in currently occupied sites until they're determined to be unoccupied pursuant to the survey protocol. At that point, those sites are opened up for logging. Through this approach, over time, all currently occupied sites are expected to be abandoned. And again, when they are abandoned, they're available for logging. And the implication of that is, over time, no spotted owl sites left to be available for spotted owls, and the ultimate removal of all suitable habitat, again, excuse me, from the project area. Without unoccupied sites to recolonize, these five spotted owls that currently are in the project area, they have nowhere to go, and they're expected to disappear from the landscape. Now, that's five owls that are there now. I'm not sure I understand that. From my recollection of the record here, that this is affecting 1% of the habitat of this owl, right? So it's only affecting 1%. So how can you say there's nowhere else to go? There's 99% is not affected by this, as I understand it. And correct me if I'm wrong. No, certainly, Your Honor. You are correct that the scale of the entire species range, it is a relatively small subset of it. The species range extends from northern California up into British Columbia. So it is a geographically widespread area. But the area surrounding the North Project area is, there's not much at all suitable habitat around it. So there is a very open question of where the owls can go from the North Project area as those sites are logged. It's a checkerboard land ownership pattern where private timberland is already almost entirely logged. Why does that matter under the statute, under the Endangered Species Act? Your Honor, a few points. So as to incidental take, again, these are five owls that are there now. And the result of logging... Five? Excuse me, Your Honor. How many? How did you say? How many? Five currently occupied spotted owl sites. Five sites? That's correct. In this 9,000 acres we have? That's correct, Your Honor. Yeah, five currently occupied out of 12 sites overall, but five of them are known to be occupied or were at the time that the biological opinion was prepared. But the point is that the Fish and Wildlife Service prepared an incidental take statement that authorized zero take and it asserted that it expected no take to result. But there is just a fundamental disconnection between that finding and this open question of what happens to those five owls. So that is a form of take that should have been... Presumably they don't open up territory that the owls occupy. And so if the territory is unoccupied, where are the owls? You're basically saying these five owls become the take. But if they're there, if they don't move, the territory they're in doesn't get logged. Your Honor, in our brief, we pointed to evidence in the record, the concession from the Fish and Wildlife Service that it expects the sites will be abandoned over the course of the implementation. And that result of logging... Where have they gone to? I mean, your point is that there aren't other places to go. And I understand that ordinarily they would expect particular locations to be abandoned. They'll set up shops someplace else. But if the someplace else isn't there, what basis is there to conclude that these owls are going to drive themselves into the ground into self-oblivion? If they don't have another place to live, why would we expect them to abandon the site? Your Honor, a couple of points. It is a well-acknowledged fact of spotted owl biology that they disperse and find new sites to colonize and to occupy. That's part of their life cycle. Yes, but what happens if they can't find another site? And that's the question I'm posing. I mean, your argument is that we will be eliminating the other sites. So do we think they're going to move away from their inhabited site even though there's not another place to go? I think your question highlights a deficiency in the biological opinion as to precisely that question. We are left without an answer to your question on the face of those five currently occupied sites will come unoccupied. But we don't know what will happen to those five owls. It is an open question. And again, your Honor, I believe that is a form of take that the Fish and Wildlife Service should have considered. And indeed, in the past would have considered it. We highlighted record evidence in our briefs indicating that in the past the Fish and Wildlife Service would have found take on these same facts. The Fish and Wildlife Service staff biologist in charge of the Level 1 team said as much in email exchanges and in meeting notes. Her concerns are captured. But just a statement in an email by one biologist can't represent the agency position, can it? No, certainly, your Honor, that is not a forward-facing agency position that's memorialized there. But it does evince that the decision to adopt this new methodology for determining take was a departure from past practice as witnessed by that staff biologist. And as well, it was escalated up to, we also pointed to emails at the state level of the Fish and Wildlife Service where the issue was escalated to indicating that they were also aware that this was a departure from past practice and that the reason for departing from past practice was that otherwise the Bureau of Land Management could not meet its allowable sale quantity. That is exactly the kind of economic consideration that Congress did not intend the agencies consider under the Endangered Species Act as the Supreme Court recognized in Tennessee Valley Authority versus Hill. Second, your Honor, the other ESA violation that I'd like to highlight before the Court this morning is, you know, the Fish and Wildlife Service, it violated the Endangered Species Act by failing to analyze how spotted owls could recolonize the project area after implementation is complete and in the future when hopefully habitat will have regrown. It's very much akin to the same deficiency that this Court identified in the PCFFA 1 and 2 decisions where there's this wholly unrealistic optimism evinced in this biological opinion just as it was in the biological opinions at issue in those cases that the species could persist, that the owls in the area could persist without suitable habitat and that eventual habitat regrowth, which hopefully will occur, could benefit the species in any way. If they're absent from the project area as a direct result of implementation, how will they come back? That is an unanswered question. Come back from where? I'm recycling back and I confess I'm not a scientist so it's a struggle for me to work through the biological opinion and so forth, but the sense I got was that areas that were occupied would not be harvested and since they need to be in suitable habitat, those areas will remain their habitat. Ordinarily you would expect owls to move from one place to another, but if there wasn't acceptable habitat available to them in that area, the inference I drew was that, okay, they must not be expecting those owls to move if there's no other place for them to go, in which case recolonization becomes an issue. They would like to find some other place they could go, but if they have a place that's suitable for them at the time, do they need to recolonize? Your Honor, when spotted owls breed and new fledglings are born, ultimately they need habitat to disperse to. So first of all, it's entirely speculative whether that can even occur in the habitat deficit conditions that currently exist, but if it were to occur with the hope that the species can persist in the area over generational cycles, for that to happen they do need unoccupied sites to colonize. Eventually the old spotted owls will, of course, die and without new habitat that fledglings can occupy, the species in the project area is likely to just blink out as a direct result of project implementation and that's not in dispute in this case. The Fish and Wildlife Service acknowledges as much. So I think the second point to your question, Judge Clifton, is over time when the habitat hopefully is expected to regrow, and that itself is not certain, but if it does regrow, the biop evinces this hope and optimism that new habitat will regrow and that development of new critical habitat. But without spotted owls able to occupy that habitat, it's not really critical habitat at that point. So the biological opinion, I think, on its face, it's exactly that same kind of unrealistic optimism that this court faulted in PCFFA 1 and 2. Your Honor, if I may, I'd like to turn to just briefly the NEPA issues and the Bureau of Land Management failed to analyze the North Project's effects on the value of retaining spotted owl sites as refugia. The North EA, that's the environmental assessment, it assumes that protecting northern spotted owl sites as refugia is futile because those occupied sites are already protected and will not be logged as long as they're occupied. But again, going back to my point earlier, Fish and Wildlife Service and BLM expect that those sites will become unoccupied over the course of and as a direct result of the implementation of the North Project. And at that point, they would not be protected anymore. So there's just a fundamental error in the agency's and Bureau of Land Management's logic in its dismissal of any value in retaining habitat refugia. The other rationale it offers is similarly problematic. The North EA also assumes that sites that are already occupied by barred owls could provide new habitat as refugia. But if the barred owl control program is successful, in other words, if barred owls are moved from the project area, those sites would then or could become available to spotted owl recolonization. And that possibility should have at least been acknowledged and analyzed in some detail in the EA, and yet it was not. Just briefly, your honors, the North EA, contrary to the district court's finding and ruling and the defendant's contention, does not properly tier to the 2016 RNP EIS. The district court held and defendants argued that the North EA tiers the EIS, but the 2016 EIS concerned the adoption of an RNP covering 2.6 million acres of habitat. It was at a much broader scale. Whereas the North Project, again, it's just over 9,000 acre series of timber sales. The entire action area is just over 11,000 acres. So it's operating at a different scale. And the RNP EIS, excuse me, the Resource Management Plan EIS did not and could not have analyzed those kinds of site-specific impacts of the timber sale. Specifically, the habitat configurations. This is very relevant with respect, again, the question of the value of refugia. The EIS did discuss at the landscape level, the broader RNP level, and the RNP scale, the value of retaining refugia. But that analysis in the RNP EIS is not made in light of site-specific habitat configurations, which are very important in terms of how spotted owls could actually occupy those specific sites and make use of them. Lastly, your honors, the BLM should have prepared an EIS here because several significance factors are met. First, the North Project is precedential for two key reasons. First of all, it is the first timber sale planned under the 2016 RNP. And it is, for that reason alone, precedential on future timber sale projects planned under the RNP. And specifically, the is also precedential. It's the first opportunity that the BLM has had to implement that zero-take mandate of the RNP and its approach of changing how take is calculated in response to that zero-take mandate. That is precedential as well. As well, an EIS should have prepared for the separate significance factor of uncertainty and controversy concerning the fate of those five spotted owls in the project area once suitable unoccupied habitat is logged and what the local extirpation of spotted owls would mean for the species that the agencies fully expect will occur. Also, spotted owl survival and recolonization of the project area and how the removal of over 9,000 acres of suitable spotted owl habitat would affect the ability of the species to recover. I could list more, but those are just some of the significant informational gaps. And certainly in our brief, we go into greater detail that BLM should have prepared in an EIS. And its failure to do so violates NEPA. And as I discussed earlier, the Fish and Wildlife Service's biological opinion does not pass muster under the Endangered Species Act. And we would ask the court to reverse the district court and set aside those decisions. And unless the court has further questions, I'd like to reserve the rest of my time for rebuttal. That's right. You can. Good morning, and may it please the court. My name is Caitlin Shugart Schmidt, and I'm here on behalf of the federal agencies. I'll be splitting time today with counsel for intervener Murphy Company, who will be taking five minutes. Your honors, this is not a case where plaintiffs are seeking to stop the sale of timber in a reserve area set aside for owls or growth forests, but one in which they are seeking to stop the sale in the comparatively very few areas where regular timber production can still be conducted, consistent with the diverse multiple-use mandates placed on Bureau of Land Management land. Outside of the more than million acres set aside already for owl reserves, the 9,000 acres of the North Project area consists of the only currently feasible group of forest stands that can meet BLM's multiple-use obligation, avoid the expanded National Monument, permit adaptive management for owls, and still meet the area's timber harvest allocation as established in the 2016 plan. And as the district court held, this project is well-supported by both science and law, and the decision below should be affirmed. I'd like to start by making sort of two overall contextualizing points, and then I'm happy to go through the arguments as presented by my friend on the other side. So the first thing I'd ask this court to keep in mind is when we're talking about the number of acres here and we're talking about the use of this particular land, it's really missing the broader picture, right, which is that all of this land is being managed under the 2016 RMP, which covered more than a million acres of area. And it was in that plan that the agencies got together and said, how can we most effectively use all of these different areas to meet our diverse needs? Timber harvest is one of them, protection of endangered species another, right? And so in that process, the agency set aside more than, I think, well, maybe not more than, but approximately 80 percent, 80 percent of that huge area specifically in the reserve categories, only in reserve. So what we're talking about here is land that is in the 20 percent of that million plus acres that was allocated towards the harvest land base. And one of the things that that planning process concluded was that when you already set aside a million acres of reserve land, that even if you set aside the entirety of that 20 additional percent, it would have a negligible benefit for protection of this, for the recovery of the species. So they've said we've done this whole planning process, we've set aside 80 percent, a million plus acres as a reserve, that is what, and that's going to contribute to the recovery of the species. Now we're talking about implementation of small logging projects in the section of land that was set aside because even if you preserved all of it, it wouldn't have a negligible benefit for the species as a whole. And the second point I would just make within that is when we're talking about how this project comes about, we do this large-scale planning. This is an efficient way of doing this process that allows us to take into account the many different needs. We do the planning on the large scale in the 2016 plan. That process, the EIS for that process involved consultations with state agencies, with tribes, public comment, extensive scientific modeling, you know, thousands of pages of scientific expertise. Then we go to implement that plan and we do it through the project. When we get to the project stage, we say, okay, we're talking about a 12,000 acre area of which 9,000 acres, setting aside the million that are in reserves, 9,000 acres could be potentially used for harvest. And then even within that, we're saying we aren't just going to go in and harvest 9,000 acres, even though we already know that if you did that, it would have a negligible benefit or leaving it all would have a negligible benefit for the species of a whole. We're saying we're going to take a decade and approximately each year of that decade, we're going to authorize a timber sale of about 500 acres. And for that specific timber sale, we are going to go out and confirm that we are not doing it in an area that there's a spotted owl. And we even know, based on the record, that if a spotted owl is identified in the area that is planned for that small sale, that the sale gets modified, right? Because that's already happened. It happened up to the point that this lawsuit was filed. So as I understand it, this process takes a decade and you're letting out 500 acres a year for the harvesting of timber. So I never was very good at math, but even I can calculate that this means that you're going to have approximately half the, or maybe approximately roughly half of the areas that is actually remaining areas still going to be intact. My understanding is that that area is not slated to be harvested, right? It's that this broader area is eligible to be. There are specific amounts of, I think it's not a forester, but these millions of board feet, right, that they're seeking to hit their targets for. And they know that they can do that with these smaller allocations of sales. So that's what they're doing over the course of 10 years responsive to how the forest looks at that particular point in time based on, you know, if someone goes out and identifies an owl, they provide that information to the agency. The agency is doing its own checks and it says, this is an area where we are safe to harvest this small amount in this particular sale. We do that. We do a determination of NEPA adequacy to ensure that we're still fulfilling our NEPA obligations throughout this process. And we move on to the next one in the next year. So it really is this sort of iterative process, which I think is a really good thing from the agency management perspective, right? The alternative might be you have an area forest and we say, we need to meet harvest allocation requirements because Congress has given us multiple mandates for this area, right? One of them is timber harvest. So we don't want to just say, well, we have X area and it has to be harvested and that's the end of the story. We want to say, we've done large scale planning. We know the best areas to do this that will not impact, because even if we preserved all of them, it'd have a negligible benefit, will not impact the owl. But we're even going to go further and say, when we do individual small sales, we're going to double check that we're not doing them in a way that's going to impact an owl if we've identified that an owl is in that area. And it's in the record that those modifications have already been made with respect to the sales. So those things are the sort of broader point. I guess in more specifically addressing the incidental take statement and the take issue, I think these questions are a little bit strange in general because we're in this particular area is going to maybe affect individual owls. But the question about whether or not we're protecting or we're conserving the species is a species wide question, right? It's not about individuals. It's about the species as a whole. And we are looking at the species as a whole, going all the way back to the 2016 plan in this long-term planning. And then further in terms of the specific take, as I mentioned before, there is a very clear and well-established and historically based survey protocol that's being used here, right? Where a BLM goes out and it does six checks each year for two years to verify that there's not occupancy. If timber harvest doesn't happen right away for whatever reason, they're required to go out and do additional spot checks. So how significant does the impact have to be to be a take? Sure. So I think that the best, sorry, the best phrasing for that must be that there's no dispute that some form of habitat modification can be a form of take, but it must be non-speculative, right? It can't just be this sort of general sense, but there might be some habitat that gets modified and that might eventually hurt an owl. There has to be a sort of direct connection shown, like a showing of actual significant impairment of the habitat for use. And that's a showing that hasn't been made here and the agency was reasonable in its conclusions that wasn't the case. And in particular, because none of this area, you could preserve all of this area and it would have a negligible benefit for the species as a whole. So it's a little weird to say you could preserve small area, but the agency has to go in and say, you have to preserve the small area in order to have a, if you preserve the small area, it will have a negligible benefit when we already know you could preserve 250,000 additional acres and it would have a negligible benefit. But if you eliminate some of the area of where this animal can live, that is, that's certainly having an impact on the habitat or the animal by definition, right? So perhaps the way to think about it would be that if you had 100 squares of habitat and you had one animal, right, and the animal needs one square at any point in time, that you could potentially remove some of that habitat and not actually impact the species, right? We're talking about very large scales and we're talking about that in the context of a conclusion that's already held that you could eliminate 250,000 acres of habitat with basically no difference, right? That the removal of all of this land, if you, right, if you, sorry, if you, it's always, it's always the converse, right? If you had kept this additional 250 acres and put it in reserves instead of the harvest land-based, it would have a negligible benefit for the species. Does the record indicate to what extent there's the ratio of habitat to owl you need for survival of the owl? I'm sure it is in there, but I don't have the citation or the number at the top of my head. But what I can say is, right, this was the point of the 2016 EIS process, where all of this extensive modeling that was done, that was done, that looked not only at, you know, where the owl is now and where it might migrate to, but it did things like, how can we figure out how to have the best contiguous blocks of habitat? How can we have the largest blocks of habitat and preserve all of those things to make sure that we are maximizing, you know, the chances for this owl, right? And that was already done in the 2016 EIS, and this project is just an implementation of one small harvest project underneath that broader planning process. All right, just quickly, I would turn to this question about the PCFFA cases and the difference between those and the situation here, if you'll permit me. So when the plaintiffs point to the PCFFA cases, they're talking about an instance where the agencies were dealing with a fish species that had very specific life history requirements, right? When you think about, like, a salmonoid species, it has to breed at a specific time in one year on very specific conditions. That's my understanding, at least, right? So the fault for the agencies there was that when they were doing their longer-term planning, say looking at a decade of planning, they didn't take into account how individual actions along the way were going to impact that species at these sort of key life history points in time, right? If you remove all habitat the one year that the species needs to breed, you're obviously going to have a problem even if you have habitat at the end of the day. But that's just not at all analogous to the situation here, right? We're talking about a lifespan, is that right? I actually can't recall off the top of my head. I'm sure interviewer plaintiffs could correct me, but we're not talking about a single-year lifespan with a single breeding cycle. But the habitat here will remain uninhabitable for, I think it's 120 years. So I'm not sure that this case is so different from the cases involving the salmon. Sure, but when we're thinking about the species as a whole, right, we already know that in terms of the species-wide management, that you could remove all of this area or you could keep all of this area and it would have a negligible benefit for the species as a whole, right? We already know that even keeping all of this habitat would really not impact the species. So it's hard to see how removing small little pieces of this habitat could significantly impact the species when we know you could keep all of it and it's not going to give you any additional benefit. And the species also has the ability to migrate. It's not, you know, limited within one river, one watershed. It can move between different areas and it has opportunities to breed more than one. Is there any impairment of the ability to migrate given the checkerboard nature of the area we're talking about, whereas I understand that this area is essentially surrounded by ongoing timber operations by private companies that are – or private land, private land with ongoing timber. So in effect, can they escape? I don't know about that question with respect to the individual owls because I don't actually think it's relevant to the underlying question here, right, which is whether or not this is going to have an effect on the species. And we already know that the reserves have set aside vast areas of contiguous land, that 80 percent, that million acres, specifically to address concerns like that, right, to make sure that we're harvesting in a way where we're putting it in specific areas. But if you have an endangered species, by definition, if you're impacting a certain – even a small segment of that limited – that declining population, that's an effect on the species. I mean, that's why it's endangered. Right. And we already know that the 2016 plan, the way it was done – and this is sort of an essential component of that planning – the plan will contribute to the recovery of the species. We know that this is the way to plan and to do these various activities in order to ensure that species as a whole, right, setting aside a million acres and reserves in continuous areas in large blocks is the best way that we can work to preserve this species rather than having some sort of checkerboard all across the whole area. When you're talking about this specific area, as I've – sorry for reiterating this, but we already know that this area, this harvest land base that's been set aside, the not the million acres, even if you preserved all of it, it would have a negligible benefit on the species. So small changes in where forest is being removed, just – we already know it can't have a non-negligible effect on the species because that was already the broader conclusion of the 2016 EIS. Briefly, I would just talk about the tiering issue. You know, I think this is a great example of why and when tiering works really well for an agency. We're talking about a process that allowed an EIS to happen that was extremely comprehensive and in-depth, you know, used a lot of modeling, a lot of consultation, a lot of opportunities for public comment. The project EA allows us to make sure that this implementation of the plan is happening within the context of the sort of safeguards that were set out in the overall plan, but it also allows us an opportunity to look for new information, right? If there have been survey changes or if something else has changed, this gives the agencies an opportunity to look at that information, to choose to include it in their planning, and then the sort of implementation of the project through the annual timber sales allows further opportunity for public comment, for updates, for new information. So it really is an efficient way of doing this sort of modeling and of extensive long-term, large-scale planning work. And the last thing I'll note very quickly is just there's really no argument here that an EIS was required rather than an EA. The precedential factor wouldn't be dispositive on its own even if it were the case, but in this case there's no precedent that's being set. This is the EA for the project. It will be implemented through the timber sales. So we'd ask you to affirm. Thank you. Julie Wise May it please the Court, my name is Julie Wise and I represent Murphy Company, the intervener, appellee, and a purchaser of timber sales under the North Project. Murphy Company urges the Court to affirm the District Court, and continuing with my colleague's contextualization approach, the North Project is extremely important to companies like Murphy Company because it authorized timber harvest over a long-term period, a 10-year period, and it authorized that harvest in harvest land-based acres. We've heard a lot about harvest land-based acres being dedicated to timber production, but in addition, almost all of the acres at issue are ONC Act timberland acres. And that's important because the ONC Act back in 1937 mandated that these ONC Act timber lands be dedicated to the dominant use of sustained yield timber production. The ONC Act actually requires that the timber on these lands be sold, cut, harvested, removed from these lands. So this is a special type of land. Most of the harvest land-based acres are ONC Act lands. And we've already heard that only 20 percent of lands under this really conservative resource management plan are set aside for timber production. Eighty percent of this resource management plan acres are set aside for protective reserves for species like the owl. It's also important to realize... But we also know that under the Endangered Species Act, as well as NEPA, really that the agency's primary mission, if you will, that statutory mission has to give way with regard to... Essentially, the Endangered Species Act is given a higher priority, if you will, than the ongoing statutory mission of the agency. Your Honor, actually we're in a different situation where you have ONC Act timber lands. So ONC Act timber lands are managed for the dominant use of sustained yield timber production. So conflicting uses cannot subservient that dominant use. Now, where exactly the ESA and the ONC Act interact and how that works is not before the Court here because the RMP already made that determination. It took the entire area and, as Government Council indicated, broke that up into a series of reserves and then a series of harvest land-based acres where harvest can occur. So, Your Honor, going back to the point I was about to make before we had our conversation, it's also important to realize that whereas the District Court and the agency analyzed the North Project under the assumption that about 5,500 acres out of those 9,000 or so acres were critical habitat for the owl, it is not now because right about the time the District Court was making its decision in the case, Fish and Wildlife Service said, you know what, we're going to revise the critical habitat for the owl and it took out all harvest land-based acres from critical habitat. So this habitat, those 5,500 or so acres, is not even critical habitat now. To your point, Judge Baker, we were talking about how much acreage is going to over the course of the project. We're about five years into the project now. Every year or so, a timber sale is offered. So far, five timber sales have been purchased and, in the aggregate, those five timber sales are going to affect about 1,901 acres, probably less because there's often fall down. So if you extrapolate to the end of this project, less than 4,000 acres in this 9,000 or so acre area will be impacted. That is far less than was assessed in the environmental documents. So it's even more conservative than we thought it would be. Also to your point, Judge Baker, you mentioned the 1% of habitat being affected. Actually, if you look at the range-wide, it's actually 0.1% of the available northern spotted owl nesting, roosting, foraging habitat that's being impacted. The 1% is at this physiographic province, and it's only one of 12 provinces. It's a big one. And then I think government counsel did a nice job explaining that we don't worry about individual owls when we're talking about jeopardy. Individual owls don't recover. What we look at is the species as a whole. So the Endangered Species Act Jeopardy Standard asks whether the project is going to jeopardize the species as a whole. So the legal question is not, what's going to happen with these individual owls? Are they going to come back? As Judge Thomas indicated, they have a less than 10-year lifespan, so these particular owls are going to be, you know, have moved on regardless. So it's not the question, and it's not the question of these individual owls. And I see I'm out of time. I would ask you to affirm. Thank you. You can proceed. Thank you. Thank you. Your Honors, the northern spotted owl is spiraling towards extinction, and every acre right now matters. The Endangered Species Act protections afforded to the species would mean nothing to the species if any given project were allowed to continue simply because it affected an area substantially smaller than its range. Spotted owls face truly a death by a thousand cuts. If that metaphor were ever appropriate, it would be appropriate with respect to the northern spotted owl at this point in time. And a species' path to extinction is often the result of many actions, any one of which may appear small in light of the species' range. But it's exactly that type of slow slide into oblivion, as this court put it in National Wildlife Federation versus that it's one of the very ills that the ESA seeks to prevent. So again, viewed in light of the species' range as a whole, the North Project could be seen as small, but it concerns logging of over 9,000 acres of spotted owl habitat. And to a point that federal defendants raised, you know, certainly the sales that have been authorized so far have averaged around 500 acres per year. But the North Project, as planned, contemplates logging of up to 9,000 acres. So it's speculative that that trend will continue. And I think the question before the court, the question, first of all, before Fish and Wildlife Service that this court has asked to review in this case is, what does the North Project look like as planned? There may be variations in implementation over time, but as planned, it does authorize or contemplates logging of over 9,000 acres. The harvest land base is not only dedicated to logging, but also to spotted owl conservation by and through the critical habitat rule. The Fish and Wildlife Service determined in its critical habitat rule that all unoccupied and likely occupied sites in the relevant critical habitat subunit are essential for the conservation of the species. And there's no carve out under Section 7 for economically beneficial activities, even to the extent that these are harvest land base acres. Counsel for Murphy Company appointed the court to the more recent revision of critical habitat, but that is not the applicable law in this case, as counsel for Murphy acknowledged in their answering brief. The North biological opinion was prepared under the critical habitat that existed at the time, and that's where the court should focus its analysis. Nor does the ONC Act in any way take away the protections that adhere to the spotted owl by virtue of its listing. Federal defendants themselves conceded in their brief that BLM must comply with the ESA and NEPA on ONC Act lands, and that is a somewhat self-evident point. There's no way that the ONC Act could be said to have preempted, I'm not even sure if that is what Murphy's argument is, but if the argument is that it's preempted somehow, the later past Endangered Species Act, which the Supreme Court recognized, as Judge Baker pointed out, reveals that conscious decision to afford endangered species priority even over those primary missions of endangered species, it cannot be said to be preempted or in any way tracked from those protections just because they are also on ONC Act land. You know, just in closing, Your Honor, again, the spotted owl as a species is plummeting towards extinction, and in this project area, this is a substantial amount of habitat, and the Fish and Wildlife Service's analysis writes off owls in this project area that have an undeniable role to play in the survival and recovery of the species, and we ask that the Thank you. We thank counsel for their arguments. This matter is submitted, and our court stands adjourned for this session. Please rise. The court for this session stands adjourned. Thank you.
judges: CLIFTON, THOMAS, Baker